IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 12-cv-03037-RBJ

RAEANN MICHELLE SANDOVAL,

      Plaintiff,

v.

CAROLYN W. COLVIN[1], Acting Commissioner of the Social Security Administration,

      Defendant.

---

## ORDER

---

This matter is before the Court on review of the Commissioner's decision denying

plaintiff Raeann Michelle Sandoval's application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") pursuant to Titles II and XVI of the Social Security Act.

Jurisdiction is proper under 42 U.S.C. § 405(g). This dispute became ripe for decision by this

Court on July 15, 2013 upon the expiration of the time available for the plaintiff to file a reply

brief. The Court apologizes to the parties and counsel for its delay in addressing the case.

**Standard of Review**

This appeal is based upon the administrative record and briefs submitted by the parties.

In reviewing a final decision by the Commissioner, the role of the District Court is to examine

the record and determine whether it "contains substantial evidence to support the

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and thus her name is substituted for that of Michael J. Astrue as the defendant in this suit. Fed.R.Civ.P. 25(d)(1). By virtue of the last sentence of 42 U.S.C. § 405(g), no further action needs to be taken to continue this lawsuit.

[Commissioner's] decision and whether the [Commissioner] applied the correct legal standards." *Rickets v. Apfel*, 16 F.Supp.2d 1280, 1287 (D. Colo. 1998).  A decision cannot be based on substantial evidence if "it is overwhelmed by other evidence in the record. . . ."  *Bernal v. Bowen,* 851 F.2d 297, 299 (10th Cir. 1988).  Substantial evidence requires "more than a scintilla, but less than a preponderance."  *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009).  Evidence is not substantial if it "constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

**Procedural History**

Ms. Sandoval first applied for disability benefits on October 30, 2009.  R. 18.  She alleges she first became disabled on October 23, 2008 due to diabetes, hypertension, obesity, sleep apnea, chronic back and hip pain, anxiety, depression, and post-traumatic stress disorder ("PTSD").  The Social Security Administration initially denied her application on June 30, 2010. *Id.*  Ms. Sandoval then requested a hearing before an administrative law judge (ALJ), and the ALJ held a hearing on September 9, 2011.  On September 21, 2011, ALJ James A. Wendland issued an opinion denying benefits.  Ms. Sandoval then appealed the ALJ's decision to the Appeals Council.  The Appeals Council denied her request for review on September 13, 2012. R. 1.  Thereafter she filed a timely appeal with this Court.

**Facts**

Ms. Sandoval is a woman who suffers from an assortment of medical issues and comes from a relatively difficult background.  She has a seventh or eighth grade education, (R. 57, 207), and her schooling seems to have been cut short, in part, due to difficulties arising out of sexual abuse and harassment.  R. 443.  Over the course of her life, she has worked as a collection

manager, a deli worker, an appointment setter, an office manager, a telemarketer, and a fundraiser.  R. 56.

Ms. Sandoval stopped working on October 23, 2008 due to a combination of physical and mental impairments and the fact that her employer was laying off employees.  R. 36-37.  She claims to experience great difficulty in performing routine tasks like cooking, walking, dressing, bathing and climbing stairs.  R. 226-27.  She attributes some of this difficulty to sharp pain in her left lower back and legs.  R. 218.  She avoids driving because of her concern that she might suffer a panic attack.  R. 48.  She has attended classes before but also states that she spends most of the day sleeping.  R. 48.  She keeps the television on for the noise but claims that she struggles to follow the storylines.  On top of all of this, she has difficulty affording the medications that her doctors have prescribed.  R. 39.  At times she has been homeless.  R. 369.

<u>Physical Impairments</u>

Ms. Sandoval has been diagnosed with a number of physical maladies.  In June of 2009, she began seeing Dr. Joan Barker, MD, at the Metro Community Provider Network for diabetes treatment and monitoring.  R. 335.  Dr. Barker's treatment notes indicated a history of diabetes, obesity, hypertension, and that Ms. Sandoval used tobacco products and did not exercise.  *Id.*  A physical exam revealed that Ms. Sandoval was generally "well developed, well nourished, [and] in no acute distress."  *Id.*  To be sure, Dr. Barker's recommendations evinced concern about Ms. Sandoval's weight and diabetes and forecast potential complications down the road.  R. 342.

In the winter and spring of 2010, Ms. Sandoval followed up with Erin Frazier, PA, at Dr. Barker's office.  These follow up appointments revealed that Ms. Sandoval was having difficulty complying with the treatment regimen outlined by Dr. Barker.  Ms. Sandoval was not taking her prescribed medication—in part because of the cost—and was not exercising or monitoring her

blood sugar levels.  R. 313-19.  As a result, Ms. Sandoval had open sores on her body due to complications from the diabetes.  R. 314.  Ms. Frazier increased Ms. Sandoval's medication and reiterated Dr. Barker's lifestyle recommendations.

Ms. Sandoval's application for disability generated several additional medical opinions. First, she underwent a consultative medical evaluation with Dr. Michael Finch on April 27, 2010. R. 251.  Dr. Finch commented on Ms. Sandoval's obesity and high blood pressure.  Apparently her diabetes was better controlled at this point, and the lesions were gone.  She reported pain in her lower back to Dr. Finch at this time.  R. 254.  He also observed that she had a normal range of motion.  *Id.*  Regarding her physical limitations, Dr. Finch concluded that Ms. Sandoval "should be able to lift and carry ten pounds occasionally and frequently and carry ten pounds over a short distance. . . . She could sit less than six hours cumulatively per eight-hour workday with frequent breaks.  She could stand and/or walk two hours cumulatively per workday with frequent breaks."  R. 255.  Attached to Dr. Finch's notes is a note explaining that an x-ray of Ms. Sandoval's lower back revealed moderate degenerative disc disease.  R. 256.

A few days after her exam with Dr. Finch, Ms. Sandoval was taken to the emergency room for hyperglycemia.  R. 266-87.  Doctors there noted that she had been non-compliant with her medication for months, and that her dosages had recently been changed.  In July, however, Ms. Sandoval's diabetes appeared to be under much better control.  Ms. Frazier's treatment notes from that month indicate that Ms. Sandoval was walking up to eight blocks per day for exercise, (R. 368), and she felt "improved," (R. 369).

Ms. Sandoval also underwent a sleep study at National Jewish Health on September 16, 2010 where she was diagnosed with sleep apnea.  R. 418-19.  She did not, however, use the recommended CPAP machine because of financial constraints.  R. 40.

Dr. Karl Chambers, a state agency physician, reviewed Ms. Sandoval's records—but did not examine her—in conjunction with her disability application. R. 72-73. Dr. Chambers opined that Ms. Sandoval could sit with normal breaks for about six hours in an eight-hour workday and stand and walk for about two hours. *Id.* Dr. Chambers disagreed with Dr. Finch's assessment of Ms. Sandoval's ability to remain seated because the earlier restriction was not supported by an x-ray or exam. *Id.*[2]

<u>Mental Impairments</u>

Ms. Sandoval, unfortunately, also suffers from a number of mental health issues. As a result of abuse as a child, Ms. Sandoval attended therapy sessions with Dr. Susan Manning. Dr. Manning diagnosed PTSD and anxiety but did not evaluate Ms. Sandoval's ability to work. R. 311. Ultimately, Ms. Sandoval did not feel comfortable in the sessions and stopped attending. R. 45-47.

In April 2010 after filing for disability, Ms. Sandoval underwent a psychological consultative exam with Dr. Gilbert Milburn-Westfall. R. 245-48. Dr. Westfall opined that Ms. Sandoval self-reported symptoms of severe depression, but he concluded that these self-reports were inconsistent with Ms. Sandoval's behavior during the exam. R. 247. Her answers, in Dr. Westfall's opinion, were evasive and when confronted about this she became "histrionic." R. 246-47. He also suggested that Ms. Sandoval was able to work but "appear[ed] to be invested in being seen as disabled." *Id.* He noted no cognitive defects and diagnosed her with mild PTSD and panic disorder. R. 247-48.

---

[2] This appears to be incorrect, however. As noted above, Dr. Finch's notes are accompanied by x-ray results.

In June 2010, Dr. Gayle Frommelt reviewed Ms. Sandoval's mental health treatment records and concluded that Ms. Sandoval had only mild restrictions on her activities and cognitive abilities.  R. 81-82.

In July 2010, Ms. Frazier prescribed Celexa for Ms. Sandoval's depression.  R. 368-74. After this point, Ms. Sandoval began seeing a professional counselor, Erin Haley.  R. 329.  Ms. Haley diagnosed recurrent moderate major depressive disorder.  *Id.*  Ms. Haley completed a work capacity evaluation in which she concluded that Ms. Sandoval had marked limitations in the following areas: ability to understand and remember detailed instructions, ability to maintain attention and concentration for extended periods, ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances, ability to work in coordination with or in proximity to others without being distracted by them, ability to make simple work-related decisions, ability to interact appropriately with the general public, ability to get along with coworkers or peers without distraction [sic] them or exhibiting behavioral extremes, ability to respond appropriately to changes in the work setting, and ability to set realistic goals or make plans independently of others.  R. 421-22.  Additionally she noted an extreme limitation in Ms. Sandoval's ability to accept instructions and respond appropriately to criticism from supervisors.  R. 422.  In the rest of the assessment areas, Ms. Haley noted only slight or moderate limitations.

Finally, in March 2012, Ms. Sandoval visited the Jefferson Center for Mental Health. There she underwent another work capacity evaluation which concluded that Ms. Sandoval had marked limitations in her abilities to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, make simple work-related decisions, interact appropriately with the general public, and accept instructions and

respond appropriately to criticism from supervisors.  R. 452-53.  She also, according to this evaluation, experienced extreme limitations in her abilities to travel in unfamiliar places or use public transportation and to set realistic goals or make plans independently of others.

ALJ's Opinion

The Social Security Administration uses a five step process to determine whether a claimant qualifies for disability insurance benefits.  At step one, the ALJ determined that Ms. Sandoval had not engaged in substantial gainful activity since October 23, 2008 (her alleged onset date).  At step two, the ALJ found that Ms. Sandoval suffered from the following severe impairments: "obesity, posttraumatic stress disorder (PTSD), moderate major depressive disorder, and disorder of the lumbar spine with left sciatica."  R. 20.  The ALJ also noted that Ms. Sandoval also suffered from medically determinable sleep apnea, type 2 diabetes mellitus, and hypertension.  R. 21.  He concluded, however, that these impairments were not severe because they did not "significantly limit the claimant's physical or mental ability to do basic work."  *Id.*  In particular, the ALJ noted that the ten months during which Ms. Sandoval's diabetes was uncontrolled in 2010 and 2011 did not meet the 12-month durational requirement for disability and was also a result of non-compliance with her treatment regimen.[3]  *Id.*  At step three, the ALJ determined that none of these impairments—alone or in combination—met or medically equaled one of the listed impairments.[4]

At step four, the ALJ noted that Ms. Sandoval is unable to perform any of her past relevant work, but the ALJ nonetheless decided that she has a residual functional capacity ("RFC") to

---

[3] This was noted on top of the fact that the diabetes did not appear to cause any symptoms that would more than minimally interfere with Ms. Sandoval's basic work activities.

[4] Ms. Sandoval does not challenge the ALJ's determination at Step 3.

perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) where the claimant is: Not required to stoop, crouch, or climb stairs and ramps more than occasionally.  Not required to climb scaffolds, ladders, and ropes, balance, crawl, or kneel.  Not required to sit for more than 45 minutes at one time without the opportunity to stand.  Not required to push or pull with the feet.  Not required to work at unguarded heights or near unguarded hazardous mechanical equipment. Not required to do more than the lower-end of detailed instructions.  Not required to have more than superficial interaction with co-workers or the public.

R. 24.

In reaching this conclusion, the ALJ decided that Ms. Sandoval's medically determinable impairments could reasonably be expected to cause her alleged symptoms of debilitating pain in her legs and hip and panic attacks coupled with extreme depression.  However the ALJ concluded that her claims about the intensity, persistence, and limiting effects of those symptoms were not credible "to the extent they are inconsistent with the above residual functional capacity assessment."  R. 25.

The ALJ reasoned that most of the medical records deal with Ms. Sandoval's diabetes. And those records frequently contain no mention of pain which is inconsistent with Ms. Sandoval's present claims of chronic pain.  The medical records also contain evidence of minimal or no limitations.  For example, during her admission to Exempla Lutheran in April 2010, a nursing assessment revealed a full range of motion in all extremities.  R. 269.  She also reports walking up to eight blocks per day for exercise.  R. 368.  Generally speaking, the record contains no indication of medical treatment for postural problems.

The ALJ then delved into those parts of the record that do contain reports of pain.  Ms. Sandoval first reported a history of sciatica in June 2009, but she made no claims of ongoing pain during the exam.  R. 290-310.  She then sought treatment for back pain in July 2011 during a visit with Ms. Frazier.  R. 433.  She mentioned that this pain had been ongoing, but again, her failure to mention this in earlier records created an inconsistency that undermined her credibility

8

in the ALJ's eyes.  R. 25.  Ms. Frazier's physical exam revealed minimal tenderness, no obvious deformities, full range of motion, grossly intact sensation, and normal strength.  R. 435.  Ms. Frazier prescribed therapy and a muscle relaxant, (R. 436), but treatment apparently was not approved for payment.

Ms. Sandoval also discussed pain during her consultative examination with Dr. Finch, who noted some symptoms of pain, but generally full range of motion.  The ALJ gave Dr. Finch's opinion "considerable weight" as the only medical professional who examined Ms. Sandoval and submitted a functional assessment.  R. 27.  Also his opinion was generally consistent with the rest of the medical evidence.  *Id.*  As far as the ALJ could tell, Ms. Sandoval very well might experience the reported pain, but he concluded based on the record that any such pain was probably only minimally limiting.  R. 26.

The ALJ also ultimately discounted Ms. Sandoval's claims about the limiting effects of her medically determinable mental impairments.  First, he noted that despite her claims of severe impairments, an official intake exam at Jefferson Center for Mental Health in August 2010 indicated that she had a Global Assessment of Functioning (GAF) score of 55 which suggested only moderate symptoms.  The person doing the intake concluded that Ms. Sandoval had good orientation, fair insight, good recent memory, and fair remote memory.  R. 447.

Later, sporadic treatment with Ms. Haley revealed some symptoms of depression and mood swings, though nothing outside normal limits.  Her GAF increased to 60 on subsequent examinations.  *See, e.g.*, R. 456.  The ALJ also noted that Ms. Haley's functional assessment "differs dramatically" from her treatment notes.  R. 28.  He observed that the assessment's inconsistency with the treatment notes and the relatively cursory justifications it provided undermined its credibility.  He therefore gave the assessment minimal weight.  R. 28.

Finally, the ALJ also considered evidence from Dr. Milburn-Westfall and Dr. Frommelt concluding that Ms. Sandoval did not present any severe mental impairments.  In the ALJ's estimation, these opinions were supported by exam findings and thorough explanations.  However, they also seemed to be contradicted by evidence in the record suggesting that Ms. Sandoval suffered from some severe mental impairments.  Therefore he gave these opinions moderate weight.  R. 29

In light of Dr. Milburn-Westfall's opinion and Ms. Sandoval's spotty treatment record, the ALJ reasoned that Ms. Sandoval's symptoms were not as severe as she alleges.  At most, the ALJ concluded, her mental limitations are moderate.

At step five, the ALJ asked a vocational expert to opine about the employment opportunities available to a hypothetical person with the residual functional capacity assigned to Ms. Sandoval.  The expert indicated that such a person would be able to find employment in the national economy as, for example, a surveillance systems monitor or a hand painter and stainer, and accordingly, the ALJ concluded that Ms. Sandoval was not entitled to disability benefits under the Act.  R. 30.

**Analysis**

Ms. Sandoval makes essentially three arguments on appeal: (1) the ALJ failed to account for the combined effects of Ms. Sandoval's severe and non-severe impairments; (2) the ALJ improperly discounted the opinions of Dr. Finch and Ms. Haley when reaching a residual functional capacity assessment; and (3) the ALJ improperly discounted Ms. Sandoval's subjective complaints of disabling limitations.  I conclude that the ALJ failed to properly account for the combined effects of all of Ms. Sandoval's medically determinable impairments but otherwise find the decision supported by substantial evidence.

### 1.   Considering Combined Effects in RFC

Even non-severe impairments need to be considered at every step of the disability determination process.  20 C.F.R. § 404.1545(e) ("we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity"); *see also Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006) (failure to consider all impairments is "reversible error"); *Langley v. Barnhart*, 373 F.3d 1116, 1124 (10th Cir. 2004).

Ms. Sandoval argues that the ALJ erred by stating in step four that all of Ms. Sandoval's impairments (besides obesity and lower back pain) had previously been addressed as non-severe or were not alleged to cause limitations.  Such a statement evinces a failure to consider the combined effect of all of Ms. Sandoval's impairments at each stage of the process, she argues. She very clearly objects to what she perceives to be inadequate discussion of her obesity and mental impairments, (Pl. Br. 28), but paradoxically those two impairments are the two that the ALJ discussed in the most detail at step four.  Presumably the other non-severe impairments that Ms. Sandoval wishes the ALJ had considered in his RFC analysis are those he identified as not severe in his step two analysis: sleep apnea, diabetes, and hypertension.  R. 21.

The ALJ gave thorough treatment to these non-severe impairments during his step two analysis.  After summarizing the medical evidence regarding Ms. Sandoval's sleep apnea, diabetes, and hypertension, he concluded that none of these impairments caused symptoms leading to more than minimal interference with Ms. Sandoval's ability to work.  *Id.*

The real question appears to be whether, after determining that these impairments were non-severe, the ALJ was required to reevaluate any impact they might have on the RFC in step four.  The plain terms of the regulation require as much.  And the Tenth Circuit appears to read

them as plainly as I do. *Langley*, 373 F.3d at 1124-25. In this case, the ALJ did not address Ms. Sandoval's non-severe impairments in step four, and he went out of his way to explain that he did not need to address them because they were previously addressed as non-severe. That explanation demonstrates that the ALJ did not comply with the regulations, because even non-severe impairments must be considered at later stages.

It is impossible for the Court to determine whether this error was harmless because the ALJ stated that these non-severe impairments created symptoms that may minimally interfere with Ms. Sandoval's ability to work. Therefore it is possible that the cumulative effect of those impairments when coupled with her severe impairments would have led the ALJ to impose additional restrictions on the RFC. It is also possible they would not have affected his analysis. But because the Court cannot be sure, the error cannot be harmless.

## 2.  <u>Weight Assigned to Medical Opinions</u>

Treating physicians' opinions are generally given controlling weight. *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003). However, before assigning a treating physician's opinion controlling weight, "[a]n ALJ must first consider whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (quoting *Watkins*, 350 F.3d at 1300). Next, the ALJ must "confirm that the opinion is consistent with other substantial evidence in the record. In other words, if the opinion is deficient in either of these respects, then it is not entitled to controlling weight." *Id.*

Even if a treating physician's opinion is not entitled to controlling weight, it is still entitled to deference and should be weighted using the factors to be applied to all medical

opinions in 20 C.F.R. §§ 404.1527 and 416.927.  *Robinson*, 366 F.3d at 1082 (quoting *Watkins*,

350 F.3d at 1300).  The factors to be considered are:

> (1) the length of the treatment relationship and the frequency of examination;
> (2) the nature and extent of the treatment relationship, including the treatment
> provided and the kind of examination or testing performed; (3) the degree to
> which the physician's opinion is supported by relevant evidence; (4)
> consistency between the opinion and the record as a whole; (5) whether or not
> the physician is a specialist in the area upon which an opinion is rendered; and
> (6) other factors brought to the ALJ's attention which tend to support or
> contradict the opinion.

*Id.* (quoting *Watkins*, 350 F.3d at 1301).  Although an ALJ should consider all of these factors, it

is not necessary that she explicitly discuss every factor.  *Oldham v. Astrue*, 509 F.3d 1254, 1258

(10th Cir. 2007).  Moreover, the ALJ is not entitled to pick and choose from a medical opinion,

using only those parts that are favorable to a finding of nondisability.  *Robinson*, 366 F.3d at

1083.

In this case, Ms. Sandoval argues that the ALJ should have given more weight to the

opinions of Dr. Finch and Ms. Haley.  Ultimately she believes the added weight would have led

the ALJ to incorporate into his RFC Dr. Finch's opinion that Ms. Sandoval cannot sit for six

hours and Ms. Haley's opinion that she suffers from extreme and marked limitations in various

activities of daily life.

Ms. Sandoval's arguments are a bit scattered, but it looks like her strongest argument is

that because Dr. Finch concluded that she could sit for less than six hours in a day, and because

the ALJ gave Dr. Finch's opinion considerable weight, the RFC should have reflected this

limitation.  To do otherwise would be to "pick and choose" from within an opinion contrary to

*Robinson*.

This argument, however, would force the Court to reweigh the evidence.  *See Harper v.*

*Colvin*, 528 F. App'x 887, 890 (10th Cir. 2013) (citations omitted) (holding that the Court "may

neither reweigh the evidence nor substitute [its] judgment for that of the agency"). Dr. Finch

was not a treating physician entitled to controlling weight. The ALJ nonetheless decided to give

his opinion considerable weight but did not adopt it unreservedly. The ALJ committed no legal

errors when he decided, in light of the entire record, that Ms. Sandoval was slightly less

restricted than Dr. Finch suggested. *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012)

("there is no requirement in the regulations for a direct correspondence between an RFC finding

and a specific medical opinion on the functional capacity in question").

For example, Dr. Chambers offered a slightly less restrictive assessment that indicated

Ms. Sandoval could sit for about six hours. R. 72-73. Ms. Sandoval seizes on the ALJ's

observation that Dr. Finch's "opinion is also consistent with the medical opinion provided by the

state agency medical consultant, the only other assessment of the claimant's physical

limitations." R. 27. The opinions might be mostly consistent, but they are inconsistent in regard

to how long Ms. Sandoval can sit in a day. Dr. Finch believes she can sit for less than six hours,

and Dr. Chambers believes she can sit for about six hours. Rather than picking and choosing,

this appears to be reasonable weighing of close but not identical opinions.

Ms. Sandoval also challenges the ALJ's treatment of Ms. Haley's opinions. Specifically,

she claims that the ALJ failed to perform the requisite two-step analysis in weighing her opinion.

Ms. Haley is not a treating source whose opinion is eligible for controlling weight, however. She

is an "[o]ther source" under the regulations. 20 C.F.R. § 404.1513(a) and (d); SSR 06-3p, 2006

WL 2329939, at *2 ("only 'acceptable medical sources' can be considered treating sources . . .

whose medical opinions may be entitled to controlling weight"). Therefore the two-step analysis

is not required for Ms. Haley's opinion.

Two-step aside, the ALJ gave proper consideration to Ms. Haley's opinion. Although the factors identified in 20 C.F.R. § 404.1527 explicitly apply only to acceptable medical sources, the Social Security Administration directs its ALJs to use those factors when evaluating other sources as well. SSR 06-3p, 2006 WL 2329939, at *4-5. In this case, the ALJ considered those factors, specifically pointing to consistency of Ms. Haley's opinions with other evidence in the record and the depth of her explanation. He noted that Ms. Haley initially assigned a GAF score of 55 to Ms. Sandoval and that over time her score increased to 60. Other than that, there were very few indications of severe mental impairments. That is, until Ms. Haley filled out the assessment in which she characterized several of Ms. Sandoval's impairments as extreme or marked. Because those latter limitations were inconsistent with Ms. Haley's treatment notes and were not explained in great detail, it was reasonable for the ALJ to discount the assessment form.

### 3.   Was the Credibility Determination Appropriate?

Ms. Sandoval challenges the ALJ's conclusion that her statements regarding the "intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 25. "Credibility determinations are peculiarly the province of the finder of fact, and we will not upset such determinations when supported by substantial evidence." *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990). However, "[f]indings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Huston v. Bowen*, 838 F.2d 1125 (10th Cir. 1988) (footnote omitted).

A claimant's statements alone are not enough to establish disability. 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 404.1528(a). But the Commissioner cannot ignore those statements as they often provide some of the best evidence of pain and other physical limitations. Therefore

the ALJ must evaluate the credibility of the claimant's testimony where that testimony could influence the ultimate finding of disability.  20 C.F.R. § 404.1529(a).  In this case, the ALJ concluded that Ms. Sandoval's testimony regarding the limiting effects of her impairments was not credible to the extent it conflicted with the RFC.[5]

Taking the broad view of the record, the ALJ concluded that Ms. Sandoval's reports of disabling back pain and debilitating mental impairments were inconsistent with the medical evidence in the record and with her own reports of her activities of daily life.  R. 24-26.  For example there is scant evidence in the record regarding her sciatica and degenerative disc disorder.  And taken as a whole, the record does not reflect consistent reports of back pain.  Ms. Sandoval objects that some of the records in which she makes no mention of her back pain were visits focused on other medical problems, and therefore it is unsurprising that her back pain fails to make an appearance in the notes.  This might be true of some records (her diabetes follow up, for example), but it was not unreasonable for the ALJ to point to the absence of any mention of back pain in the notes accompanying her admission to the hospital for hyperglycemia.  R. 257-89.

Moreover, minimal medical evidence is not the only reason the ALJ suggested Ms. Sandoval's testimony lacked some credibility.  He also noted the fact that she was walking up to eight blocks per day for exercise.  R. 24-26.  He did not, contrary to Ms. Sandoval's argument, cherrypick evidence from the record supporting his conclusion, nor did he impermissibly base

---

[5] I have written elsewhere of my discomfort with the SSA's routine use of boilerplate language to describe the ALJ's assessment of the claimant's credibility.  *See, e.g.*, *Lloyd v. Colvin*, 12-cv-3350-RBJ (Feb. 6, 2014).  I still believe this boilerplate is unhelpful and can complicate review of the ALJ's decision by obscuring the analysis.  However, at least in this case, it is clear that the ALJ relied on specific evidence and performed a thorough analysis before concluding Ms. Sandoval's testimony lacked credibility.  *See Holbrook v. Colvin*, 521 F. App'x 658, 664 (10th Cir. 2013).  Therefore I am convinced that the ALJ appropriately dealt with Ms. Sandoval's testimony.

his finding that she was not disabled on nothing more than the fact that she is capable of performing household tasks. Rather he looked at the record as a whole, credited the fact that she has back problems that are severe, credited the fact that those severe problems caused pain and some limitations, and ultimately, in light of some contradictions in the evidence, decided not to credit her testimony that the symptoms made her unable to work. These are valid reasons for an ALJ to discount a claimant's testimony. 20 C.F.R. § 404.1529(c).

Ms. Sandoval raises the same arguments about the weight the ALJ gave her testimony about her mental impairments. In particular, she contends that the ALJ should have accounted for her lack of financial resources before concluding that her failure to seek consistent mental health treatment undercut her claims about the severity of her mental impairments.

Ms. Sandoval is correct in noting that SSR 82-59 directs ALJs to consider a claimant's inability to afford treatment before making a finding that the claimant has failed to follow prescribed treatment. However, there are two problems with this argument. First, the regulation cited by Ms. Sandoval makes it clear that inability to pay is relevant where there are not free community resources available. As the government points out, Ms. Sandoval was directed to a free community clinic for mental health treatment but failed to attend all of the sessions. R. 27, 311-12. The ALJ did not err in noting this failure to seek treatment.

Moreover, failure to seek treatment was not the only reason the ALJ decided that Ms. Sandoval's symptoms were not as severe as she alleged. The ALJ also considered Dr. Milburn-Westfall's opinions that Ms. Sandoval was exaggerating her symptoms and was invested in being seen as disabled. The ALJ also had the relatively inconsistent treatment notes from Ms. Haley that assigned GAF scores of 55 and 60. And finally he had Dr. Frommelt's similar opinion that Ms. Sandoval did not suffer from marked limitations as a result of a mental impairment. The

totality of this evidence constituted substantial evidence supporting the ALJ's decision to discount Ms. Sandoval's relatively incongruous statements about the severity of her mental impairments.

**Remedy**

Ms. Sandoval requests that the Court remand the case to the ALJ for an immediate award of benefits, or in the alternative to remand for further consideration. "[O]utright reversal and remand for immediate award of benefits is appropriate when additional fact finding would serve no useful purpose." *Dollar v. Bowen*, 821 F.2d 530, 534 (10th Cir. 1987).

I cannot say that additional fact finding would serve no useful purpose in this case. Indeed, because I am remanding for the ALJ to consider the cumulative impact of Ms. Sandoval's severe and non-severe impairments, additional fact-finding is exactly what is required here. Other than this oversight, I can find no other legal errors in the ALJ's opinion which is otherwise supported by substantial evidence.

**Order**

The decision of the Commissioner is reversed. The case is remanded to the Commissioner for further proceedings before the ALJ.

DATED this 17th day of March, 2014.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge

18